The Equitable Life Assurance Society of the United States v. James G. Coats et al.

*Liability of sureties on insurance agent's bond.*

An insurance agent's bond was made to cover all liabilities and delinquencies of the agent under his existing or any future appointment, and whether as sole agent or a joint agent with others, and notwithstanding changes in the tenor of the agreement or agreements under which he should act.  *Held,* that the sureties were not bound by this for the acts of a cashier appointed by the company to assist the agent, but would be liable for such moneys as came under the control of the agent or of subordinates for whose selection he himself was answerable.

Error to Saginaw.    Submitted June 18.    Decided Oct. 6.

Assumpsit on bond.    Plaintiff brings error.    Affirmed.

*Wheeler & McKnight* and *Alfred Russell* for plaintiff in error.

*Benton Hanchett, H. H. Hoyt* and *C. H. Gage* for defendants in error.

COOLEY, J.   This action was instituted against defendant Coats as principal and the other defendants as sureties upon a bond in the penal sum of ten thousand dollars, dated November 28, 1874, with the following condition:

" Whereas, the said Jas. G. Coats has been appointed by agreement, or agreements, agent of said Equitable Life Assurance Society of the United States for the State of Michigan:

Now the condition of the above obligation is such, that if the said Jas. G. Coats shall well and truly perform all the duties of his office as agent of said society, and shall faithfully account for all moneys of said society by him received, and shall promptly and faithfully account for and pay over to said society all moneys due on policies or renewals passed through the agency of said Jas. G. Coats, or return the policies or renewals in due time to said society, and shall properly preserve and deliver up, when requested, all books, papers and property of every kind belonging to said society, and shall otherwise fully do and perform all that is required by the said agreement or agreements, then this obligation shall become null and void, otherwise it shall remain in full force and virtue.

It is understood between said obligors and obligee that this bond shall continue and remain in force until another bond or bonds, approved by the president of said society, shall be substituted in its place, and shall cover all liabilities and delinquencies of the said agent or agents, to the said obligee, whether the same shall arise under this present appointment, or under any future appointment of the said obligee, whether as sole agent or as joint agent with any other person or persons.   The sureties hereto hereby expressly waiving notice of any change in the terms of the agreement or agreements, appointing such agent or agents, or change of district occupied by him or them, or otherwise, and obligee being at liberty to vary the same from time to time, as may be agreed on between the said agent or agents and obligee."

Breaches were alleged on the failure of Coats to pay over moneys received as premiums on policies and renewals, the defaults beginning with the month of October, 1876. On the trial evidence was given by one Scott, superintendent of agencies for the plaintiff, that in September, 1876, deeming it necessary to have a cashier at the agency in Detroit where Coats was operating for the company, he went there and agreed with Coats upon an appointment, and on Coats' recommendation appointed William H. Harrington as such cashier; that the appointment was evidenced by an agreement signed by himself for the society, and by Harrington and Coats, the material points in which were the following:

"1st. That said Harrington, cashier, shall upon receipt of all vouchers from said society or elsewhere, make proper entry of the same upon the agency books of account, and make proper distribution of said vouchers for collection.

2d. All remittances of money received on account of collections or otherwise by said cashier shall be by him deposited in the Merchants' & Manufacturers' National Bank, Detroit, to the credit of the said Equitable Life Assurance Society.

3d. All collections made by the said Coats or received by him from subordinate agents, shall be promptly turned over and accounted for to the said cashier.

4th. All checks or drafts for the withdrawal of money from said Bank of Detroit shall be signed by the said Coats as manager, and also by the said Harrington as cashier.

5th. No funds shall be withdrawn or paid out except for the purpose of remitting the same to the said society, or in payment of commissions as the same may from time to time accrue and expenditures authorized by the said society.

6th. The reports of the monthly business shall as heretofore be rendered in the name of the said Coats, and countersigned by the said Harrington as cashier.

7th. The said cashier shall have charge of the books of account, and all vouchers, and perform all the clerical work required by the necessities of the business, and carry out instructions of said Coats, except when the same may conflict with the rules of the said society."

The society also agreed to pay Harrington a stipulated compensation for his services, and Coats relinquished a certain percentage of the commissions previously allowed him.

Scott further testified that in November, 1876, Coats applied to him and to J. W. Alexander, vice-president of the society, for a loan of $1000, from the money collected at the Detroit agency, but this was declined until the agency could be visited; that witness went to Detroit soon afterwards, where he found that Coats had already appropriated not only the $1000 he had requested the loan of, but also $1000 taken the preceding month; that witness declined to sanction these transactions and reported them to the vice-president, while Coats in his monthly statements reported them as " advances." Subsequent correspondence between Coats and the vice-president was put in evidence, from which it was plain that with much fault-finding the sums above mentioned were suffered to stand for the time as advances or loans.

The plaintiff further gave evidence that on or about March 7, 1877, an accountant of the society was sent to examine the Detroit agency, and that on the examination being made, a deficiency was discovered, in addition to the two sums standing as advances, of $2569.11. Thereupon a paper was obtained from Coats, addressed to Scott, acknowledging the deficiency as his own, stating that the sum was made up of new premiums which had accrued since January 1st preceding, asking for time to fix up the amount, and that his sureties be not notified, and making pledges of future correct conduct if he was permitted to retain his agency. In addition to this the plaintiff gave evidence tending to show that Harrington had accounted fully. On behalf of the defendants Coats testified that the letter admitting the defalcation was extorted from him by Scott, and given under a fear of losing his agency, and on the promise of Scott that he should be permitted to retain the amount of the deficiency as an advance.

There was considerable further evidence in the case, but the above is all that need be stated here. The plaintiff in the circuit court insisted that Coats and his sureties were liable for all the deficiency that was proved to exist at the agency, whether attributable to the agent or to the cashier; but the circuit judge restricted the liability to such moneys as should appear to have been collected by or paid over to

Coats, or deposited to his credit so as to come under his personal control. The jury returned a verdict for defendants.

It was not disputed that there was a deficiency at the agency, and that either Coats or Harrington was responsible for it. As the money was not distinctly traced to Coats,. except by his admissions, which were retracted on the trial, the plaintiff contended that this was unnecessary, since the defendants, by their bond, had expressly made themselves responsible, not only for the conduct of Coats, but also for that of any other person who should be appointed to assist him. We find nothing in the bond which favors this view. The bond was to cover all liabilities and delinquencies of Coats under his existing or any future appointment, and whether as sole agent or joint agent with others, and notwithstanding changes in the terms of the agreement or agreements under which he should act. The appointment of a cashier, therefore, and the transfer to him of a portion of the agent's duties, would not affect the liability on the bond. But the bond contains no undertaking on the part of the sureties to hold themselves responsible for any third person whom the society might see fit to employ in their service, however closely he might be associated with Coats in his duties, or however willing or even anxious Coats might be for his appointment. The sureties undertake for Coats, but not for any unknown person or persons whom the society may deem proper to engage at the same agency, even though engaging his services may seem for the benefit and protection of the sureties as well as of the society. The sureties stand upon the exact terms of their contract.

But it is said the defendants agree to account for all moneys " due on policies and renewals passed through the agency of said Jas. G. Coats"; and Harrington was but the cashier at that agency. No doubt these words were intended to bind the defendants for the conduct of the subordinates of Coats in collecting and accounting for moneys,. but we cannot suppose they contemplated anything further. For the selection of such subordinates Coats would be

responsible, and he and his sureties ought justly to undertake for their integrity and care. But when a new office was created the case was different. The incumbent of such an office might or might not be selected with Coats' assent, and his duties might or might not be prescribed to suit Coats. The wishes of Coats were consulted in this instance, and he was made a party to the instrument whereby the cashier was appointed; but this was probably because Coats was to remit some portion of his compensation; it was certainly not because Coats had a legal right to be consulted, or because he could veto any appointment the society might see fit to make, and which to him might seem unfit.

As the duties were apportioned between Coats and Harrington, it was possible for the latter to receive moneys for the society without the knowledge of Coats, and to appropriate them to his own use without depositing them. In such a case they would never come under Coats' control. It seems from the record unlikely that such was the case with the deficiency complained of, but if the plaintiff is wronged by the judgment the fault lies with the jury, not the court.

The judgment must be affirmed with costs.

The other Justices concurred.